## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 17-14262-CIV-MAYNARD

NORMAN WILLIAM HILL,

     Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner,
Social Security Administration,

     Defendant.

_____/

FILED by _____ D.C.

NOV 1 9 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

### ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 25)

**THIS CAUSE** comes before this Court upon the above Motion.
Having reviewed the Motion, Response, Reply, and Administrative
Record (DE 18)[1], and having held a hearing thereon on October 30,
2018, this Court finds as follows:

#### BACKGROUND

1.    The Plaintiff applied for disability insurance
benefits and supplemental security income under Titles II and
XVI of the Social Security Act on November 4, 2013 (with a
protective filing date of October 17, 2013). The application set
was denied initially and after reconsideration. On May 24, 2016
an Administrative Law Judge ("ALJ") rendered a decision finding
the Plaintiff not disabled under the terms of the Act. The
Appeals Council denied his Request for Review on May 16, 2017,

---

[1] This Court uses DE 18's pagination for its citations to the record.

thereby leaving the ALJ's decision final and subject to judicial review.

2.    The Plaintiff has a high school education. He completed his primary education (and subsequent vocational training programs) despite a very difficult childhood and domestic pressures. He went to work at an early age to support his mother and his disabled sister. His father had left when he was very young. At school he was a loner who found socializing difficult.

3.    The Plaintiff has a consistent earnings history from 1981 to 2007. For the time period 2002 to 2007 he worked as a temporary construction laborer.

4.    The Plaintiff claims a disability onset date of September 28, 2007. That also is his date last worked. The Plaintiff explains that a personal dispute arose between himself and a co-worker. He complained to his supervisor. The supervisor responded by asking him to quit, which he did. Then the property boom ended, and he was unable to find new construction work.

5.    The medical record begins at this time, too. On September 27, 2007---the day before his date last worked---he went to the hospital complaining of progressively worsening chest pain and sore throat. Viral acute pericarditis was

diagnosed. The condition responded to treatment. The Plaintiff
was 43 years old at the time.

6.     By 2010 he was homeless, living in a camp in wooded
lot. There are some health department treatment notes from mid
2011. They show treatment for a skin infection and for eye
problems (myopia and a cataract). He was unable to make it to an
eye clinic for care. There was no eye clinic locally in town,
and transportation problems limited his ability to travel to the
next nearest one. It appears that the eye conditions remain
untreated to-date.

7.     In 2012 his mental health began to decompensate. He
developed emotional problems and psychotic symptoms which
culminated on April 13, 2012. He became very angry with a new
resident in the homeless camp. He began to have violent and
homicidal thoughts toward that person as well as suicidal
thoughts about himself. He did not act on those thoughts.
Instead he called the police on himself for help, and he agreed
to mental health hospitalization. The police took him to the
hospital's Behavioral Health Clinic where he received inpatient
treatment.

8.     The Plaintiff complained of violent thoughts, anxiety,
and depression. He had poor dentition, poor hygiene, and was
disheveled. He denied any alcohol or drug use. (The homeless

camp he had joined was strictly dry, he later explained.)
Testing confirmed the absence of any alcohol or drugs in his
system.

9.     By April 19th he had stabilized and was discharged.
His condition responded well to medication (Haldol, Tripleptal,
and Vistaril). His ending GAF score reflects the improvement,
increasing from a low of 15 to a high of 60 (indicative of a
moderate to mild condition). He was interacting normally with
others at the hospital and attending group sessions. Mood
disorder was the concluding diagnosis.

10.    For follow-up care the hospital referred the Plaintiff
to the New Horizons mental health clinic. He went there on April
26th. The New Horizons clinic in turn referred him to the Mental
Health Association ("MHA") which began treating him in May 2012.

11.    At his initial appointment at MHA he complained of
depression, anger, poor sleep, and interpersonal conflict at the
homeless camp. The attendant observed signs and symptoms
consistent with what the Plaintiff was reporting. MHA continued
his medications and instituted frequent counseling and therapy
sessions. The goals of treatment were to decrease his depression
and negative rumination; to improve his self-image; and to learn
coping skills by which to handle life stressors.

12.   On May 29, 2012 he returned to the health department complaining of osteoarthritis in both knees. He likewise complained of chronic joint pain at a follow-up appointment at New Horizons on June 1st.

13.   The Plaintiff improved significantly with counseling and therapy. He was fully compliant with treatment, and the therapist's notes show improvement as early as that July. His depression eased and he began to feel hopeful. His mood stabilized. His thought process improved. He was having fewer auditory hallucinations (hearing voices). He was slowly opening up and talking about difficult past issues.

14.   He also was growing weary of being homeless. Couch surfing for a few days gave him a welcomed respite. It appears that a prior disability application was denied as was his application for Shelter Plus benefits. He felt discouraged by the feeling of being unable to work and by transportation problems. He was open to part-time work if it was close by. The frustration from all of those stressors caused a worsening of his condition in July 2012. Diagnoses ranged from mood disorder to major depressive disorder with psychotic features. Still he persisted with treatment, and he maintained control over his depression and auditory hallucinations.

15.  That August and September he began to feel motivated to stop smoking. He began to find support in a friendship. He was working odd jobs but remained under financial stress. He no longer was disheveled and his personal hygiene was better. His medications were adjusted to reduce their sedating effect.

16.  In October 2012 he was granted Shelter Care Plus benefits and moved into an apartment. He no longer was homeless. His caregivers at MHA explain that the Shelter Care Plus program subsidizes the housing of homeless persons with serious mental disability.

17.  For the rest of the year his overall condition improved as reflected in his GAF score that had increased to a 66 (indicative of just a mild condition). His overall condition had improved. Making the housing adjustment was a difficult process nevertheless. He withdrew socially. Both his personal insight and personal hygiene worsened. He remained under financial stress, too, because he had to pay rent (albeit at a reduced rate). He had counted on Social Security benefits to make up the difference, but his then pending application (that pre-dates the one under review now) had been denied. Moreover his attorney declined to represent him on appeal.

18.  His date last insured for Title II disability insurance benefits was December 31, 2012. In order to collect

that particular benefit, he must establish the onset of disability on or before that date, generally speaking. The date last insured did not affect the ALJ's analysis, however; the ALJ considered the full evidentiary record. This Court adds that the later medical evidence relates back to and is informative of his mental health condition as it existed before his date last insured.

19.    The Commissioner sent the Plaintiff to Dr. Ahmed for a consultative physical examination on January 2, 2013. The Plaintiff reported a long history of low back pain. He reported being able to do household chores and some minor outside work. He also reported depression but said that his psychotropic medications were helping. The physical examination was overall normal except for a mildly positive straight leg raise test and some lumbar spasms. Dr. Ahmed also observed hand tremors which the doctor attributed to anxiety (although other treatment notes attributed that symptom to his Haldol medication, this Court notes). Dr. Ahmed diagnosed lumbago and depression. Dr. Ahmed opined that the Plaintiff can sit, stand, or walk for six hours and can lift 25 lbs. frequently and 50 lbs. occasionally.

20.    The Plaintiff continued to attend monthly therapy and counseling sessions through mid 2013. Those treatment notes show the Plaintiff to be overall stable with the benefit of mental

health treatment and support. Still there was room for further
improvement. He did not feel as stable as he would like. He
continued to struggle with socialization, remaining resistant to
group sessions. He remained unhygienic. Physical pain and his
age were hindering his ability to find work, he felt.

21.  At some point in mid 2013 he was transitioned out of
MHA's individual therapy program. However he continued to
receive case management and prescription management services.
The Administrative Record possibly is missing three or four
additional treatment notes from this period of time in mid 2013,
the Plaintiff asserts at footnote 5 of his Motion.

22.  In November 2013 the Plaintiff reported feeling
suicidal, and MHA conducted a crisis assessment. There are no
direct medical records of the event. Instead a later letter from
the MHA mentions it. In that letter, found at page 414, MHA
reports that in November the Plaintiff "required crisis
assessment and safety planning for the therapy department due to
emerging suicidal ideation." He stabilized after a medication
adjustment. Moreover his case manager, Bonnie Hurd, recalled in
her Medical Summary Report dated December 4, 2015 that the
Plaintiff had been hospitalized at least two times. The November
2013 crisis assessment may be that second hospitalization event
(in addition to the precipitating April 2012 hospitalization).

23. Around that same time, on November 4, 2013, he submitted the disability application under review now. The Plaintiff claimed disability due to depression and auditory hallucinations with related violent ideations. Page 234 of the Administrative Record provides a summary of his mental health condition. There the mental health impairments of social avoidance, poor self-esteem, decompensation when stressed, and need for encouragement are claimed, and the need for mental health services to keep the Plaintiff stable is stressed. Lastly the Plaintiff claimed disability due to the physical health condition of pain in his back, ankles, and knees.

24. The case worker who took his application described the Plaintiff as "paranoid during the interview". The Plaintiff "kept looking over his shoulder and his hands were shaking during the interview. He fidgeted with the paperwork in his hands various times during the interview but was very cooperative through the whole process." (The case worker's note is found at page 219.)

25. Page 414 of the Administrative Record is a letter from MHA to the Commissioner. The Plaintiff's case manager, Bonnie Hurd, and the program's clinical director, LMHC Jeanne Shepherd, wrote the letter. The letter summarizes the treatment services provided to-date: 29 individual counseling sessions, 31 case

management meetings, and six psychiatrist appointments after the initial evaluation on April 14, 2012. The Plaintiff's diagnoses as of October 31, 2013 were mood disorder, history of psychosis, and anxiety disorder. "Through treatment," they explained, the Plaintiff "has been able to identify stressors and seek therapeutic support when needed" thereby avoiding need for repeat inpatient hospitalization.

26. Two psychologists rated the Plaintiff's mental residual functional capacity ("RFC"). Neither examined the Plaintiff but rather opined on the basis of the record then available to them. Dr. Green rendered her advisory RFC rating in January 2014 (contemporaneous with the initial denial of the Plaintiff's application). Dr. Green opined that the Plaintiff remains capable of performing simple routine tasks, instructions, and decision-making on a sustained basis "as motivated". She furthered that the Plaintiff can "cooperate and behave in a socially appropriate manner" (albeit with possible "difficulty accepting criticism from supervisors and peers") and can "react and adapt appropriately to the work environment." Dr. Reback rendered his RFC rating in April 2014 (contemporaneous with the second, reconsideration-stage denial). Dr. Reback rated the Plaintiff as similarly able to perform simple routine work.

He added that the Plaintiff is moderately limited "in the ability to interact with the general public."

27. The ALJ gave both RFC ratings great weight. He found them to be "based on a thorough review of the available record", to be "supported by the overall record," and to "provide a holistic assessment of the claimant's mental limitations."

28. For 2014 the Administrative Record contains treatment notes from the Plaintiff's treating psychiatrists at MHA who managed his prescriptions. The Plaintiff saw Dr. Moss three times (in March, May, and June) and Dr. Yergen four times (in July, September, October, and December). These treatment notes show that the Plaintiff was doing overall well on his medications (Vistaril, Trileptal, benztropine, Prozac, Cogentin, and Haldol) and supportive therapy with no more violent ideations. His mood was stable and he was sleeping better. His hygiene improved. His primary diagnosis now was of major depressive disorder with psychosis in partial remission. Nevertheless his GAF score remained low at 50 (indicative of a serious condition).

29. On March 26, 2014 Ms. Hurd wrote the Commissioner with an update on the Plaintiff's status. That letter is found at page 416. There Ms. Hurd reported that to-date the Plaintiff has attended eight individual counseling sessions (which had stopped

in June 2013), 19 case manager sessions, and seven psychiatric appointments. Ms. Hurd reported the ongoing diagnoses of mood disorder, psychosis history, and anxiety disorder. She reported the additional stressors of economic problems, healthcare access problems, and lack of primary support. The Plaintiff takes the medications of Haldol, Trileptal, benztropine, hydroxyzine, and Prozac. Treatment has consisted of medication management, stressor identification, therapeutic support, suicidal ideation therapy, and housing support. As a result of treatment he has stabilized, and he has avoided inpatient hospitalization.

30.    In March 2014 the Plaintiff began working at Goodwill as a donations attendant on a part-time basis. He initially reported doing well at his job. That October he anticipated the job becoming busier. At the December appointment with Dr. Yergen, the Plaintiff said he still was doing well generally and at work. However he was getting flustered at work. He managed it by walking away and putting the frustration out of his mind.

31.    Although the Plaintiff reported doing well overall, Dr. Yergen's treatment note from December 16, 2014 (which begins at page 434 of the Administrative Record) suggests problem areas. The Plaintiff was disheveled and his hygiene poor. He had an abscessed tooth. Eye contact was poor and he was non-communicative. His affect was restricted. Dr. Yergen continued

by noting that despite the improvements to-date with treatment and despite his denial of such feelings, "he continues to appear guarded and paranoid". "[H]e is quite restricted and blunted on exam". Dr. Yergen regarded that to be the Plaintiff's "baseline". Dr. Yergen listed out areas of impairment: the Plaintiff is not sociable, has social functioning problems, is having problems with his ADL's, has very limited intellectual capabilities, and has a quite concrete thought process. Dr. Yergen noted the discrepancy between how the Plaintiff presents himself as stable and functioning well but in reality is struggling. Dr. Yergen noted the Plaintiff's "struggles with everyday situations and with his finances as he doesn't have the capability to have more meaningful productive work." Lastly Dr. Yergen noted the Plaintiff's report of back pain, which "has been an ongoing problem for him and limiting factor" but for which he cannot afford medical care. Dr. Yergen diagnosed major depression recurrent with psychotic features and gave a GAF score of 50 indicative of a serious condition.

32.  On December 30, 2014 LMHC Jeanne Shepherd wrote a letter to the Commissioner with a status update. She reported that while the medication is managing the Plaintiff's psychosis, he still is having "difficulty cultivating and maintaining supportive relationships and has no family support. He also has

difficulty interacting with others, handling work stressors and engaging in leisure activities."

33. The Plaintiff's job at Goodwill lasted about a year, ending in April 2015. Ms. Hurd reports that the Plaintiff was fired without re-hire eligibility. Ms. Hurd reports that he was fired for absenteeism without doctor excuse notes. Ms. Hurd says that the Plaintiff was hearing command voices and was nauseous with an upset stomach. He would not go see a doctor for an excuse note because he does not trust doctors. At the administrative hearing the Plaintiff explained that he was having difficulty dealing with the public and with co-workers. He felt judged and was prone to argue. He was feeling anxious and depressed, and he missed too many days of work. Ms. Hurd reports that the Plaintiff's symptoms eased after he stopped working. The Plaintiff's earnings from that job---$7,304 in 2014 and $2,774 in 2015---are too low to count as Substantial Gainful Employment, the ALJ later found.

34. In February 2015, according to his case manager, Bonnie Hurd, the Plaintiff's long term mental health care was transferred from MHA back to New Horizons. That transfer meant further delay in the resumption of therapy and counseling. The Plaintiff went on New Horizons' waiting list for that service.

35.    Treatment notes resume June 2015 at New Horizons. His treating psychiatrist there, Dr. Jean, continued his mental health care and noted the Plaintiff's need for increased social interaction and increased social support. Dr. Jean gave a GAF score of 52, similar to the concluding GAF score from MHA. The Plaintiff saw Dr. Jean again in August 2015. The Plaintiff had no complaints other than anxiety. The goal of treatment, Dr. Jean noted, was to maintain stability. The Plaintiff's GAF score increased to a 55.

36.    The Plaintiff's case manager, Ms. Hurd, wrote a Medical Summary Report for the Commissioner, and it is dated December 4, 2015. That report begins at page 439 of the Administrative Record, and it recounts the Plaintiff's mental health-related history. Ms. Hurd reports the Plaintiff's lack of family to rely on. He worked in construction but struggled to keep jobs. Voices would tell him to quit, that he is no good, and that he should kill himself. He could not keep up with his jobs and would be fired. Employment overwhelms him, and he starts to hear voices. The auditory hallucinations in turn lowers his self-esteem and confidence, and he then responds by isolating himself. He also struggled to maintain housing, even before he lost his construction job in 2007. He had lived in the

woods for four years before he obtained a HUD rent subsidy for chronically homeless and mentally disabled adults.

37. Ms. Hurd described the Plaintiff's various mental health impairments. He has poor hygiene and does not keep up with laundry or house cleaning (and he does not see it or recognize the extent of that problem for himself). He has pronounced social impairments. He depends on mental health care and other charity care services without which his psychosis and suicidal ideation would take over. He struggles to be employable despite extensive vocational rehabilitation services.

38. "Due to serious mental illness and unpredictable emergence of hallucinations and command voices," Ms. Hurd concluded her report, the Plaintiff "is incapable from engaging in any type of gainful employment even with support systems in place". She pointed to the Plaintiff's unsuccessful "short term placement by Vocational Rehabilitation with Gulfstream Goodwill" as evidence. "Norman meets the requirements for disability under the Social Security Guidelines for persons with depressive disorders with severe impairments in functioning and should be awarded disability."

39. The Plaintiff saw Dr. Jean twice in 2016 before the administrative hearing. Those treatment notes suggest overall stability and tolerable mood changes but also increased

irritability, poor sleep, and a constricted affect. His GAF
score ranged from a 50 to a 55. At the most recent appointment
trazodone was added to his medications.

40.    In February 2016 the Division of Vocational
Rehabilitation closed the Plaintiff's case and transferred it to
New Horizons. Its letter, found in the record at page 279,
explained to the Plaintiff that "New Horizons can better meet
your rehabilitation needs."

41.    The administrative hearing was held on April 26, 2016.
He recalled that it was after becoming homeless when he
developed paranoia and violent ideation symptoms. He heard
voices that instructed him to harm others and himself. He has
had that auditory hallucination symptom ever since. However his
medications help to control it (but he has been without those
medications since October because of their cost). He also
manages the voices by listening to music and by avoiding people.
His primary difficulty is with social interaction. He becomes
angry around others. He becomes panicky in public spaces. He
claimed impaired short-term memory, decision-making, and
attention span, as well as a racing mind. In addition to those
mental impairments, the Plaintiff claimed the physical
impairment of a long history of back pain.

42.   As for his daily life activities, he stated that he does light cooking (with a microwave). He has difficulty keeping up with laundry and cleaning house. He can go weeks before bathing. He walks to the grocery store to buy groceries. Otherwise he rides public transportation to get around. He wears headphones when he goes out in public. For recreation he uses the internet and watches TV. He has four long-term friends whom he visits and helps out. The Plaintiff was 51 years old at the time of the administrative hearing.

43.   At Step Two of the disability analysis the ALJ found just two conditions that qualifies as a "severe impairment": the mental health conditions of an affective disorder and anxiety disorder. The ALJ found no other mental health condition, such as depression or psychosis, to rise to that level. The only physical impairment that the ALJ considered was low back pain, and the ALJ did not find it to rise to the level of a severe impairment either.

44.   The ALJ did not find the Plaintiff's mental health condition to be of disabling severity. First the ALJ did not find it to be of Listing-level severity for purposes of Step Three of the disability analysis. At that step of the analysis the ALJ considered the three broad domains of mental health functioning. He found only a mild impairment of daily life

activities; moderate impairment of social functioning; and moderate impairment of concentration, persistence, and pace. Fourthly the ALJ counted no episodes of decompensation of extended duration. The ALJ found no evidence of a decompensation risk from placement in the workplace setting, and the ALJ saw no evidence of dependence on structure and support to maintain functional ability. Instead the ALJ found the Plaintiff's daily life activities and social functioning to be evidence of a significant ability to respond to mental demands and environmental changes. The ALJ described the Plaintiff's daily life and social interactions as "somewhat normal".

45. The ALJ emphasized certain aspects of the record that he felt contradicted the Plaintiff's disability claim. The ALJ noted the four year gap between the Plaintiff's date last worked and his inpatient hospitalization. It was not until that April 2012 when the Plaintiff began receiving mental health care. The ALJ noted the Plaintiff's quick stabilization with inpatient treatment and the overall success of medication at managing the Plaintiff's psychosis. The ALJ regarded the Plaintiff's mental health treatment since the hospitalization as generally conservative in nature. Many treatment notes describe the Plaintiff's condition as mild (although at other times as moderate, the ALJ added). Just mood disorder was diagnosed

(although severe major depressive disorder with psychotic features also was an ongoing diagnosis, the ALJ added). The mental status examinations were relatively benign. The ALJ also placed emphasis on the Plaintiff's own reports. In the disability application paperwork the Plaintiff described a broad range of daily life and social activities and he did so again (to an extent) at the hearing. At many of his treatment appointments the Plaintiff reported no or insignificant complaints.

46.   The ALJ regarded the treatment notes from 2014 and 2015 to show no dramatic changes in the Plaintiff's condition. The ALJ saw no evidence of overt psychosis. As for the Plaintiff's condition in 2016, the ALJ noted that his hallucinations were tolerable and manageable. The ALJ found Dr. Rashid's January 2016 notation of medication treatment compliance to contradict the Plaintiff's assertion that he had not taken medication since October 2015.

47.   As for opinion evidence, the ALJ gave great weight to the RFC advisory opinions by Dr. Green and Dr. Reback. The ALJ gave little weight to the Medical Summary Report from Ms. Hurd dated December 2015 in which she opined that the Plaintiff is unable to work. The ALJ found that opinion inconsistent with what the treatment notes show. The ALJ also saw nothing in the

record that supported Ms. Hurd's report of two hospitalizations and drug trials. The ALJ found the fact that medications successfully managed the Plaintiff's condition to contradict Ms. Hurd's assertion. The ALJ noted the GAF scores of record with an overall range of 15 to 70 and which were in the 50's (indicative of moderate severity) in 2015 and 2016. The ALJ gave the GAF scores little weight based on the general rule that GAF scores do not necessarily convey information helpful to a disability analysis. The ALJ did not address the other opinion statements and status reports of record.

48. Rather than disabled, the ALJ found the Plaintiff able to perform a reduced range of medium exertion work. As for physical exertion the ALJ limited the Plaintiff to occasional climbing of ladders, ropes, and scaffolds, and to occasional postural movements. As for the mental demands of work, the ALJ found the Plaintiff capable of performing simple routine tasks on a sustained basis (with breaks every two hours). The ALJ limited interaction with co-workers and supervisors to an occasional basis and limited interaction with the public to a less than occasional basis. However the ALJ found the Plaintiff still able to adapt to routine workplace changes with normal supervision. (The ALJ did not address whether the limitation to occasion interaction with supervisors is compatible with the

"normal supervision" that the Plaintiff needs to manage
workplace changes.)

49. The ALJ found the RFC to preclude the Plaintiff's
return to his past work. Citing the Medical-Vocational
Guidelines ("Grids") and the testimony of the Vocational Expert
who also testified at the administrative hearing, the ALJ found
that the Plaintiff could perform the other jobs of linen-room
attendant, laundry laborer, and warehouse worker.

## DISCUSSION

50. Judicial review of the Commissioner's decision is
limited to a determination of whether it is supported by
substantial evidence and whether the proper legal standards were
applied. See Lewis v. Callahan, 125 F.3d 1436 (11th Cir. 1997).
Supporting evidence need not be preponderant to be substantial
so long as it amounts to more than a scintilla; in other words,
it is such relevant evidence that a reasonable person might
accept as sufficient and adequate to support the conclusion
reached. See id. at 1440. If the decision is supported by
substantial competent evidence from the record as a whole, a
court will not disturb that decision. Neither may a court re-
weigh the evidence nor substitute its judgment for that of the
ALJ. See Wolfe v. Chater, 86 F.3d 1072 (11th Cir. 1996). See
also, Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).

While the Commissioner's factual findings enjoy such deference, a court is free to review the Commissioner's legal analysis and conclusions de novo. See Ingram v. Comm'r, 496 F.3d 1253, 1260 (11th Cir. 2007). See generally, Washington v. Comm'r, 2018 WL 5318147, *3 (11th Cir. 2018) (stating the general rule that the court will affirm the Commissioner's decision if substantial evidence supports it and if the Commissioner applied the correct legal standards).

51. This Court considers first whether the Commissioner correctly evaluated the intensity and persistence of the Plaintiff's claimed medical condition and its limiting effects. The standard that governs that evaluation is SSR 16—3p. SSR 16—3p governs the evaluation of the Plaintiff's claim because it became effective on March 28, 2016[2], before the ALJ rendered his Decision two months later on May 24, 2016. It therefore appears that the ALJ erred by applying the previous standard of 20 C.F.R. § 1529 and SSR 96—4p. In any event, under either standard, this Court sees insufficient basis by which to affirm the ALJ's finding that the Plaintiff's impairments are less severe than alleged. Stated differently this Court sees no competent substantial evidence to support the ALJ's decision to

---

[2] Footnote 27 to SSR 16—3p says that an ALJ shall apply it when making a determination and decision on or after March 28, 2016.

discount the credibility of the Plaintiff's disability allegation.

52.    The ALJ's denial relies on the late start of mental health treatment, the overall conservative nature of that treatment, and its success at managing the Plaintiff's psychosis. This Court sees in the record evidence a more complicated history. There is evidence that the Plaintiff may have had a long history of difficulty maintaining employment and housing and how that difficulty may stem from mental health problems. It is true that the mental health treatment record does not begin until April 2012, many years after his date last worked, but there is no evidence that the Plaintiff ever had health insurance or other financial means to seek treatment. The Plaintiff then eventually decompensated to the point where there was an unavoidable need to seek help.

53.    The Plaintiff entered treatment from a very low point of functionality and mental health. It is true that he improved quickly, from that low start point. Since the start of treatment he has been fully compliant, and he has avoided complicating factors such as substance abuse. However this Court would not characterize the course of treatment as "conservative". Treatment has consisted of regular individual therapy sessions and a variety of different psychotropic medications (anti-

psychotics, mood stabilizers, anti-depressants, and a sleep sedative). The Plaintiff also has benefitted from a range of ancillary supportive services such as housing, food stamps, and vocational training. This combination of treatment and support services stabilized the Plaintiff and improved his mental health (most notably by easing his psychosis).

54.   The ALJ focuses on that success at easing the Plaintiff's psychosis. However the ALJ did not consider those work-related impairments that exist at the Plaintiff's "baseline". Nor did the ALJ consider the risk of decompensation. A mental health patient who is stable with therapy and support may decompensate in a more demanding setting such as in the workplace. See Mace v. Comm'r, 605 Fed.Appx. 837, 843 (11th Cir. 2015) (noting the importance of considering a claimant's functional level outside of the structured setting). That may have happened here. The Plaintiff tried to return to work, but he was fired from that job, even despite its low work hours and presumed accommodative atmosphere.

55.   The record evidence shows that functional problems remain even after his psychosis was brought under control. For the most part the Plaintiff has struggled with self-care tasks (keeping a clean home, laundry, hygiene, and oral health) and with social interactions. The Plaintiff has experienced bouts of

increased symptoms even as treatment improved his condition overall. One such bout of increased symptoms incurred in the several months preceding the hearing date.

56. The ALJ placed emphasis on the Plaintiff's own reports of normal functioning. However the medical evidence brings their reliability into doubt. The medical evidence suggests that the Plaintiff may not necessarily see for himself the problem areas. The medical evidence likewise indicates at least some degree of limited insight. The evidence suggests that he also may not comprehend questions as well as it seems. See Mace, 605 Fed.Appx. at 842 (noting that a claimant's mental functional ability may be less than what the claimant asserts or wishes).

57. Ultimately that is for the fact-finder to weigh out. This Court offers the above characterization only to show that the Plaintiff's history is more complicated than what the ALJ suggests. The ALJ seems to have placed great emphasis on those particular factors that suggest normal functional ability but without taking into account the full context and without taking into account those factors that suggest impairment. It is for that reason that this Court does not find the ALJ's credibility finding to enjoy sufficient evidentiary support.

58. This Court considers next the medical opinion evidence. The standard that governs the evaluation of medical

opinion evidence in this case is 20 C.F.R. § 404.1527. Generally
speaking, the Commissioner gives the medical opinion of a
treating source controlling weight. Such evidence is not
automatically determinative, however. An ALJ may decide to give
treating source medical opinion evidence less than controlling
weight (or give it no weight at all). To do that 20 C.F.R. §
404.1527 requires the ALJ to say how much weight (if any) he
does give it and to explain why. See also, Winschel v. Comm'r,
631 F.3d 1176, 1179 (11th Cir. 2011) (stating the general rule
that "[w]ith good cause, an ALJ may disregard a treating
physician's opinion, but he must clearly articulate the reasons
for doing so") (internal citations omitted).

59. The Plaintiff points to the treatment note by Dr.
Yergen from December 16, 2014 (and found in the record at page
434). The ALJ did mention it and did cite a few parts of it.
However the ALJ did not consider it as an item of medical
opinion evidence. Consequently the ALJ did not say how much
weight he accords it and if he was discounting it---which the
Defendant argues the ALJ implicitly did---the ALJ did not
articulate the reasons for doing so. The Plaintiff argues that
the ALJ thereby erred.

60. This Court begins by finding that the subject
treatment note does count as "medical opinion" evidence. Title

20 C.F.R. § 404.1527(a)(1) defines "medical opinions" as statements:

> that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions.

The subject treatment provides that same kind of information and insight. Dr. Yergen goes beyond merely taking notes for that day's appointment, and the treatment note contains more than just background medical evidence. Dr. Yergen added to that treatment note an explanation of the Plaintiff's condition and functional ability. Second this Court finds that Dr. Yergen counts as an acceptable treating source. She is a psychiatrist who has treated the Plaintiff both personally on several occasions beforehand and as part of MHA which has treated the Plaintiff regularly for an extended period of time. Taken together, the above shows why the ALJ should have evaluated Dr. Yergen's December 16, 2014 treatment note as a medical opinion statement under 20 C.F.R. § 404.1527.

61.   The Defendant concedes that the ALJ did not consider the subject treatment note expressly as such. However she argues against remand on the basis that the ALJ implicitly rejected it. It is true that the ALJ did mention it. In citing it the ALJ conceded that it showed "a number of abnormalities, including

poor hygiene, withdrawn attitude, minimal responsiveness, and restricted affect." "On the other hand," the ALJ continued, it showed normal functioning, too. It showed his "thought content and processes to be appropriate. The claimant denied any hallucinations or suicidal or homicidal ideation. Indeed he reported that he had not experienced psychosis since beginning to take medications." From there the ALJ proceeded in his record review to observe how subsequent treatment notes likewise show the Plaintiff's condition to be responsive to medication.

62.    This Court does not discern from the ALJ's limited discussion of the subject treatment note an implied analysis that complies with 20 C.F.R. § 404.1527 in substance. For one the ALJ's recitation of its contents is too limited in scope. The ALJ omits much of what Dr. Yerger says. This Court cannot find that the ALJ rejected medical opinion evidence when it is unclear what the ALJ considered that opinion to be. Indeed the ALJ seems to construe the subject treatment note as evidence that weighs against the Plaintiff's disability claim (rather than as evidence that supports it but which the ALJ discounts). Secondly this Court discerns from the overall analysis no reason express or implied for giving the subject treatment note little evidentiary weight. The ALJ does not indicate "with at least some measure of clarity" "some rationale [that] might have

supported" doing so. See Winschel, 631 F.3d at 1179. This Court therefore finds Winschel to support remanding this case back to the Commissioner for consideration of the medical opinions that Dr. Yerger expressed in his treatment note of December 16, 2018. See also, Baez v. Comm'r, 657 Fed.Appx. 864 (11th Cir. 2016) (remanding the case where the ALJ's reason for rejecting material medical opinion evidence was unknown).

63. Even if this Court were to construe the above finding as an implicit rejection of the treatment note, it would lack the support of competent, substantial evidence. The ALJ seems to cite the treatment note as further evidence of improvement with medication. However, as this Court discusses above in regard to the ALJ's credibility finding, the evidence shows the Plaintiff's condition to be more complicated than that. Indeed it is that very same treatment note that provides important insight into the nature of the Plaintiff's condition and how to construe the other medical evidence of record. Moreover the letters from the Plaintiff's case manager and program director (only some of which the ALJ accounted for) buttress Dr. Yergen's explanation that the Plaintiff's condition is severe and causes substantial impairment even with the benefits of treatment and stabilization.

64. This Court does not find the ALJ's reliance on the two advisory RFC ratings to overcome the above shortcomings. The two advisors are neither examining nor treating sources. Their RFC ratings therefore do not bring the insight that the treating sources and others knowledgeable about the Plaintiff's situation do. Secondly the two medical advisors did not have the benefit of the full record when they rendered their RFC ratings. They did not have, for example, the explanations and reports from treating sources and others familiar with the Plaintiff's situation that shows his mental health condition to be more complicated and his functional impairments to be broader than previously understood. While an ALJ may give an advisory RFC great weight, the record must provide evidentiary support to do so, see SSR 96—6p, which is lacking here.

65. For the foregoing reasons this Court agrees with the Plaintiff that this case should be remanded for re-consideration. The ALJ shall re-consider all medical opinion evidence and non-medical opinion evidence and give them their appropriate weight in compliance with the governing standard. The ALJ also shall re-evaluate the intensity and persistence of the Plaintiff's symptoms under the SSR 16—3p standard.

66. The Plaintiff does not object to the ALJ's Step Two and Step Three mental health findings. Although not raised as an

objection, this Court's above record review and discussion causes doubt of whether those findings enjoy competent, substantial evidentiary support, too. Therefore the Commissioner shall include the Step Two and Step Three mental health impairment findings in the reconsideration. Lastly this Court reminds the Commissioner of the need to explain how the RFC accounts for the Step Three findings. See Winschel, 631 F.3d at 1180–81.

67.  This Court will leave it to the Commissioner's discretion whether to open the reconsideration to the Plaintiff's pain-based impairment allegations. The record before this Court shows pain complaints over the course of the treatment history, but this Court sees insufficient evidence therein (and the Plaintiff raises no relevant arguments or objections here) to compel this Court to remand the physical impairment part of the ALJ's analysis back for reconsideration, too.

**CONCLUSION**

68.  Competent, substantial evidence does not support the ALJ's mental RFC assessment, and in turn it does not support the ALJ's conclusion that the Plaintiff is not disabled. The ALJ relied on certain aspects of the record evidence that weigh against the Plaintiff's disability claim (although the

Plaintiff's full treatment compliance and attempt to return to work are factors that might also support his credibility, this Court adds). However the ALJ seems to have omitted other material parts of the record, evidence that suggests his condition is impairing in ways other than his psychosis and which place the Plaintiff's own reports of adequate daily life and social functioning into fuller context. This Court therefore finds remand warranted in this case for reconsideration as instructed above.

It is therefore,

**ORDERED AND ADJUDGED** that the Plaintiff's Motion for Summary Judgment (DE 25) is **GRANTED**. The ALJ's Decision is **REMANDED** back to the Commissioner for reconsideration pursuant to Sentence Four of 42 U.S.C. § 405(g).

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this _____ day of November, 2018.

SHANIEK M. MAYNARD
UNITED STATES MAGISTRATE JUDGE